### STATE *v.* PORT and others.

(*Circuit Court, N. D. Georgia.* July, 1880.)

1. MURDER—RESISTANCE TO REVENUE OFFICERS—POWER TO ARREST— RIGHT OF SELF-DEFENCE—ARREST WITHOUT WARRANT.

Preliminary examination upon the charge of murder.

*S. B. Spencer,* for the State.

*A. S. Darnell,* Ass't Dist. Att'y, *John L. Hopkins, J. S. Bigby* and *Geo. S. Thomas,* for defendants.

WOODS, C. J. The defendants, thirteen in number, were charged with the murder of William A. Jones, on June 24th last, near Red Oak station, in Campbell county, in this state. An affidavit, charging them with this crime, was made by one Mary E. Jones, before John B. Suttles, a justice of the peace of Campbell county, who thereupon issued a warrant for the arrest of the defendants. By the authority of this warrant they were taken into custody by the sheriff of Fulton county, within whose limits they were found. The defendants thereupon filed their petition for a removal of the prosecution against them to this court, under section 643 of the

Revised Statutes of the United States. After full argument an order for removal was made. The cause now comes up for a preliminary examination of the charge against the accused, the question being whether they should be held to answer the accusation against them at the next term of this court, or be discharged.

The reply of the defendants to the charge made against them is set forth in their petition for the removal of the cause to this court, and is relied on at this hearing. It is as follows: "At the time the alleged killing occurred they and all of them were officers appointed under and acting by authority of the internal revenue laws of the United States; that they were deputy collectors of internal revenue in and for the second collection district of Georgia, which said collection district includes said county of Campbell, and that each of your petitioners were there, and then and there, acting under color of said office and of said internal revenue laws, and that the act for the alleged commission of which said affidavit was made, and said warrant of arrest was issued, was performed, if performed at all, in their own necessary self-defence, and while engaged in the discharge of their duties as deputy collectors of internal revenue, as aforesaid, and while acting under authority of said internal revenue laws of the United States as aforesaid; that what they did was done under and by right of their said office; that it was their duty to seize illicit distilleries and the apparatus that is used for the unlawful distillation of spirits, and that while attempting to seize such distilleries as aforesaid in said collection district, and in said northern district of Georgia, and being engaged in such attempt to seize said distilleries under and by authority of the revenue laws of the United States as such deputy collectors as aforesaid, they were assaulted and fired upon with guns and other deadly weapons by a number of armed men, and that in the defence of their own lives they returned the fire of their assailants, which is the alleged murder mentioned in said affidavit and warrant of arrest as aforesaid."

The testimony establishes beyond controversy the following facts: On the night of June 23d the defendants, all of

whom held commissions as deputy collectors of internal revenue for the second collection district of Georgia, and one of them, Robert Bolton, also a commission as deputy United States marshal, took the 11 o'clock train on the Atlanta & West Point Railroad from Atlanta to Red Oak, about 15 miles distant. Their purpose was and their instructions were to traverse the country in the vicinity of Red Oak, to search for and destroy illicit stills. Violent resistance to the enforcement of the internal revenue laws of the United States has not been uncommon in the vicinity of Red Oak. This is shown by the following facts in evidence: One Eason, who was suspected of being a witness against violators of the revenue laws, had been murdered in that locality. About 5 o'clock P. M. of April 22d last two illicit stills, belonging to one Brown, were seized in the vicinity of Red Oak, by a party of revenue officers, and were carried off by them in the direction of Atlanta. The officers were pursued as far as East Point, within six miles of Atlanta, by an armed mob of between 20 and 40 men. They passed up the road in pursuit, making threats against the officers, and it was declared in the crowd that no still should again be seized in their neighborhood. In this party was Jones, the man who was killed on June 24th.

In the latter part of May last John C. Hendrix, deputy collector of internal revenue, seized near Red Oak two stills, one of them running. The man in charge of it fled to a house shouting for help, and fired a gun. Immediately firing began in all quarters, and men with guns were seen running in different directions, and the revenue officers thought it prudent to retire from that neighborhood, and did retire immediately.

On June 16th last Hendrix, with a posse in search of illicit stills, while passing along the highway, about three miles from Red Oak, was fired upon by a man standing in the door of a house. He fired six shots with a repeating rifle. After proceeding about a quarter of a mile Hendrix and his party were again fired into, at the same moment from three different directions, by men in ambush. He concluded that his force was too weak, and abandoned the search for the still he was

trying to find. Two of the defendants in this case were of the party of Hendrix, and the facts of these assaults were communicated by him officially to the office of the collector, and personally to the defendant Port. The reputation of the Red Oak neighborhood for violent resistance to the revenue law officers was known to the defendants. On this occasion the defendants each carried a breech-loading carbine, and had a supply of loaded cartridges. During the night of June 23d, and before the day of June the 24th, Port and his posse had found and destroyed three distilleries, and before 12 o'clock of June 24th two more, all within three miles of Red Oak station.

When halting for rest, after daylight, a party of three or four armed men were seen in the vicinity of the revenue posse, one of whom dropped down behind a tree. Among them was Jones, the deceased. They attracted the attention of the revenue officers, who all sprang to their feet, and the men ran away. Whenever a halt was made during the day the revenue posse put out pickets to guard against surprise and attack. About 2 o'clock P. M. of June 24th the defendants were proceeding along a public road in the direction of a still near Trimble's mill, of which they had heard, and which it was their purpose to seize. The road was bordered on both sides with woods and underbrush. At a bend in the road the revenue party suddenly met five men, all armed, who leveled their guns upon them. One of them was Jones, the deceased, another Ratteree, the third Ross, and the other two unknown. Ross, who was a little in advance of the others, was taken into custody and told to come along with the revenue party, and if found all right he would be set at liberty. He was disarmed. The other four men ran into the woods and disappeared, and as the revenue party advanced along the road opened fire from ambush on them. The guns of the revenue men were at this time empty, by the orders of Port, the officer in charge. They at once loaded and returned the fire, shooting rather at random at the spots where they saw the smoke of their assailants' guns. After the firing had ceased the revenue men proceeded on their way, and had advanced

about 200 yards further along the road, when they were again fired on from the underbrush with which the road was skirted. About 15 or 20 steps from the road was a cotton field, enclosed by a fence. The space between the road and fence was thickly covered with underbrush, and it was from this covert that the fire upon the revenue men was delivered. Jones, who was afterwards killed, was seen to fire, although only a part of his person was exposed. When he fired he was about 10 steps from the fence, and was seen to turn and run towards the fence. The fire of the party in the bushes was promptly returned by the revenue men. Seven or eight shots were discharged into the ambush. The officers then at once charged through the underbrush to the fence. Ratteree was found in the fence-corner outside the field, wounded in the arm and finger. Jones was seen to climb the fence and start across the field. He climbed the fence 15 or 20 steps from where Ratteree was lying. As Jones got down from the fence he fell forward on his hands and knees. He got up and started across the field, ran 25 or 50 yards and fell again. He again got up and ran from 100 to 125 yards, and fell dead. One of the witnesses thinks he fell, in all, four times. Jones was found to be shot through the body, the ball entering his back and coming out at his breast. A double-barreled shot gun was found near him, both barrels of which appeared to have been recently discharged, and a pouch containing ammunition was found on his person. Two other persons disappeared in different directions.

The claim on the part of the state is that as Jones was running through the fields, with his back to his pursuers, he was fired upon by them, and so received the fatal shot. This claim is supported by the evidence of Ross, who was in custody of the revenue party at the time, and by F. G. Suttles, who witnessed the occurrence from his house, 500 or 600 yards distant.

The testimony for the defendants is to the effect that but few shots were fired after Jones crossed the fence, and these were aimed at the other persons, who were endeavoring to escape in other directions. One witness for the defence, and

he one of the defendants, testifies to firing by the revenue party at Jones after he crossed the fence.

All the facts above stated, with the exception of those that relate to the firing upon Jones while he was crossing the field, are sworn to substantially by nine of the defendants. Whenever there is any contradiction of their evidence to these facts, it rests solely on the testimony of Jesse Ross, who is now in custody, charged with conspiracy with Jones, Ratteree, and others, to resist the revenue officers on the occasion when the homicide occurred.

The material point on which Ross differs from the other witnesses is whether Jones and his party, or the revenue posse, fired first. Ross swears that on both occasions the revenue men fired first. But, according to his own statement, he was not in a position to observe accurately which party fired first, for on both occasions he was in the rear of the revenue party, which was scattered somewhat along the road, and the fire upon them came from the front. Besides, the probabilities of the case are against the truth of Ross' statement on this point. I assume, therefore, and it was not seriously disputed by the prosecution, that the testimony of the nine witnesses, who are scarcely more interested in this inquiry than Ross, establishes the fact that Jones and his comrades, on both occasions, fired first.

The charge against the defendants is murder. They do not deny the homicide, but aver that it was committed in self-defence; that it was, therefore, justifiable, and no crime. The duty of the court, upon this inquiry, is regulated by section 4738 of the Code of Georgia, as follows: "The duty of the court of inquiry is simply to determine whether there is sufficient reason to suspect the guilt of the accused; to require him to appear and answer before the court competent to try him, and, whenever such probable cause exists, it is the duty of the court to commit."

The question for decision, then, is whether, upon the facts of the case, there is sufficient reason to suspect the guilt of the accused. Does probable cause for the charge against them exist? In my judgment the answer will depend upon

the solution of another inquiry, and that is, where was Jones when he received the wound of which he died? If, as claimed by the prosecution, he was in the cotton field, having desisted from his attack upon the revenue posse, was fleeing from the revenue posse, and they, when all danger to them had passed, fired upon him, and shot him in the back and killed him, the accused should, in my judgment, be required to appear at the next term of this court to await the action of the grand jury. If, on the other hand, he received the fatal shot while in the ambush from which he had fired upon the revenue officers, and at or immediately after the time of the discharge by himself and his comrades of their weapons at the revenue officers, it is perfectly clear that there is no ground whatever for the charge of the murder to stand on. The evidence, in my judgment, establishes conclusively the latter hypothesis.

The testimony of Suttles, one of the witnesses for the prosecution, and of Robert Bolton, one of the defendants, tends to show that Jones received his wound at least as early as the time when he crossed the fence. Suttles says that Jones, from the time he crossed the fence, ran in a kind of a trot, and again, after he got up after his first fall, which was near the fence, he ran slowly and in a bent position. Bolton testifies that he saw Jones when he was within a few steps of the place where he had climbed the fence, and he appeared to be hurt and weak. But the conclusive evidence on this point is the following: The testimony for the prosecution shows that after his death the clothing of Jones was removed from his person and his body carefully examined. He was found to be hurt in but one place, and that was the wound from the ball which passed through his body. Besides this not a scratch could be found upon his person. At the place where Jones climbed the fence there was fresh blood on the top and second rails, and blood on the leaves and grass, both outside and inside the fence. The fact that the blood was there, and that the place where it was found was where Jones climbed the fence, is as clearly established as any fact in the case.

The conclusion is, therefore, inevitable that Jones received his only wound, the one of which he died, outside the fence of

the cotton field, and, at the very furthermost, not more than ten steps from where he had stood when he fired his last shot at the revenue party. The strip of underbrush from which the party in ambush fired was not more than 10 or 15 steps wide, and filled the space between the road, in which the revenue party was moving, and the fence. Into this narrow strip of underbrush, where their assailants were hiding in ambush, the revenue officers, to the number of 8 or 10, fired their guns. Ratteree was hit and found in the fence corner. Jones was hit as he turned to retreat after firing his last shot. He was bleeding from his wound when he reached the fence. The whole thing occupied only a few seconds.

If Jones had been found dead in the underbrush, or anywhere outside the fence, it seems to me that the charge of murder against the revenue officers would have been preposterous. The fact that after receiving the fatal shot he ran between one and two hundred yards does not change the case. No shot fired at him after he crossed the fence took effect upon his person. If the shots fired while he was crossing the field did not hit him, the persons firing them may, by that act, be guilty of some offence, but it certainly is neither murder nor manslaughter. An attempt was made to show that if Jones had been shot in the ambush it would not have been possible for him to run the distance he did before he fell and died. This attempt, in my judgment, signally failed. The proof that Jones was shot in the ambush is perfectly conclusive, and outweighs any theory based on facts which are not shown to exist.

The case, then, is this: Jones was fatally shot by a party of revenue officers, standing in the highway, while he and his comrades were in ambush and firing from cover on the revenue posse. The facts, in my judgment, so far from showing that there is cause to suspect the revenue officers of the crime of murder, show conclusively that they acted in self-defence, and that the homicide was justifiable. It has been claimed by the prosecution that the arrest of Ross by the revenue officers was unwarranted and without authority. If this be conceded, yet his arrest was no concern of Jones and Ratteree

and their comrades, and was no justification or excuse for their firing upon the revenue officers. But, in my view of the facts, his arrest was not unlawful. It is shown by the evidence, and there is no conflicting testimony on this point, that this band of five armed men, of whom Ross was one, met the revenue officers in the highway, where they were passing along in the discharge of their duty, and levelled their guns at them. That Ross and his comrades knew who the revenue men were, and what their business was, the testimony does not leave in any sort of doubt. Their conduct, therefore, in thus confronting, with arms, the revenue officers was a violation of law, and justified the arrest of the whole party.

To hold that these revenue officers, one of whom was also a deputy marshal, should have waited, before making an arrest for an offence of which they were eye-witnesses, until they could get a United States commissioner and swear out a warrant, is entirely to misconceive the power and duty of an officer of the law. Their duty was then and there to arrest, if they could, these men who had obstructed them in the discharge of their duty.

The right of the citizens to resist an officer who is wilfully acting illegally, without authority, or in excess of his authority, is undoubted. I shall always uphold that right; it is essential to all free government. On the other hand, the right of the officer, acting in the line of his duty, to protect his person and his life from unlawful violence, stands upon the highest grounds.

In this case there was a party of 13 men, all bearing commissions as deputy collectors of internal revenue for the district in which this unfortunate tragedy occurred. They were required, by their duty and their orders, to go through this neighborhood. They were supposed to be protected by the majesty of the law and the authority of the United States. The revenue laws of the general government were, to say the least, of as great force in Campbell county, and in the vicinity of Red Oak station, as the laws of the state of Georgia.

This posse had as clear a right under the law to break up illicit stills as the collector of Campbell county had to exact

the payment of state and county tax. For a citizen to fire upon them while in the discharge of their duty was as heinous an offence against law as it would have been to fire upon the tax collector of the county to prevent him from enforcing the payment of the county tax. These revenue officers knew their peril. They knew that they went to the discharge of their duty with their lives in their hands. They went armed, so as to resist unlawful violence. They were compelled at every halt to station pickets to prevent surprise. They were sober men. The testimony is that their orders were that not a drop of ardent spirits should be drunk by the party while on the expedition, and that the orders were obeyed. They proceeded in the discharge of their perilous duty cautiously and lawfully. Their guns were carried empty until occasion arose for their .e. They were twice fired on from ambush while traveling the highway by concealed assailants, whose numbers they could not and did not know, standing in the public road, upon the property of the public, where they had a right to be, and where their duty required them to be. They returned the fire of their assailants, aiming generally at those points in the thicket where they saw the smoke of their assailants' guns. This fire wounded slightly one of the men in ambush, and wounded fatally another, and for this act the court is asked to say that there is probable cause to believe that these officers were guilty of the crime of murder. I am not of that opinion. In my judgment, they fired the shot by which the unfortunate and misguided Jones was killed strictly in self-defence. They ought, therefore, to be discharged from custody, and it is so ordered.